**Not for Publication**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIT AUTO SALES, INC. D/B/A SALIT AUTO SALES ON BEHALF OF ITSELF AND OTHERS SIMILARLY SITUATED,<br><br>*Plaintiff*,<br><br>v.<br><br>CCC INFORMATION SERVICES INC., LIBERTY MUTUAL GROUP INC., AND LIBERTY MUTUAL HOME AND AUTO SERVICES LLC, D/B/A LIBERTY MUTUAL FIRE INSURANCE COMPANY AND WAUSAU UNDERWRITERS INSURANCE COMPANY,<br><br>*Defendants*. | Civil Action No. 19-18107 (JMV) (MF)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

In this putative class action, Plaintiff alleges that Defendants had a nefarious scheme to settle third-party insurance claims at artificially low amounts. Specifically, based on a single incident, Plaintiff asserts that Defendants provided erroneous information about the value of "comparable" vehicles to establish an improper comparison in making an offer to settle Plaintiff's insurance claim. Plaintiff, however, also alleges that it caught onto the scheme and was not duped. As a result, Plaintiff did not rely on any allegedly improper information, nor did Defendants' actions cause any damage to Plaintiff.

Presently before the Court are two motions to dismiss Plaintiff's First Amended Complaint ("FAC"), D.E. 10, filed by (1) CCC Information Services Inc. ("CCC"), D.E. 24; and (2) Liberty Mutual Group, Inc., Liberty Mutual Home and Auto Services LLC, d/b/a Liberty Mutual Fire

Insurance Company, and Wausau Underwriters Insurance Company (collectively, "Liberty Mutual"), D.E. 23.  Plaintiff Salit Auto Sales, Inc. d/b/a Salit Auto Sales ("Salit Auto"), on behalf of itself and others similarly situated, opposed the motions to dismiss, D.E. 29 and 30, and Defendants filed reply briefs, D.E. 32 and 33.  The Court reviewed all the submissions in support and in opposition[1] and considered the motions without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b).  For the reasons discussed below, the motions to dismiss are **GRANTED.**

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff Salit Auto is a used car dealership located in Edison, New Jersey.  FAC ¶ 15. Defendants Liberty Mutual Group, Inc. and Liberty Mutual Home and Auto Services, LLC sell and provide insurance in New Jersey, sometimes under the names Mutual Fire Insurance Company and/or Wausau Underwriters Insurance Company.  FAC ¶ 16.  Defendant CCC Information Services "acts in concert with insurance providers, including Liberty Mutual, in adjusting claims for reimbursement of the value of total loss vehicles."  FAC ¶ 17.

In November 2017, Plaintiff listed a 2011 Cadillac CTS Performance Sedan (the "subject vehicle") for sale at its dealership.  FAC ¶ 19.  The subject vehicle was advertised on Plaintiff's website and on Autotrader.com for a list price of $10,998, which Plaintiff asserts was "at or below

---

[1] CCC's moving brief will be referred to as "CCC Br.," D.E. 24-1; and Liberty Mutual's moving brief will be "LM Br.," D.E. 23-1; Plaintiff's brief in opposition to CCC's motion to dismiss will be "Pl. Opp. CCC," D.E. 30; and Plaintiff's brief in opposition to Liberty Mutual's motion to dismiss will be "Pl. Opp. LM," D.E. 29.

[2] The factual background is taken from the FAC, D.E. 10.  When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

the fair market retail value of the vehicle at that time." *Id.* ¶ 20. On January 21, 2018, while a Salit Auto employee was driving the subject vehicle, another driver collided with it. *Id.* ¶ 21. Plaintiff filed a third-party property damage claim with Liberty Mutual, the other driver's insurer. *Id.* ¶ 22. An adjuster from Liberty Mutual inspected the subject vehicle, determined it was a total loss, and offered a cash settlement to Plaintiff. *Id.* ¶¶ 23, 24.

A Liberty Mutual Claims Resolution Representative, Logan Hubert, emailed Plaintiff's Sales & Finance Manager, Alan Salit, on February 23, 2018 with an inspection report that confirmed the subject vehicle – which it called the "Loss Vehicle" – was a total loss. *Id.* ¶ 28. Also included with the email was a document entitled "CCC One Market Valuation Report," (the "Report") which Hubert described as the "valuation" for the subject vehicle. *Id.* The Report is the critical document in this case.

According to the Report, the subject vehicle's retail value was $7,671 plus sales tax. *Id.* ¶ 29. The Report stated that the subject vehicle had a "Base Vehicle Value" of $8,257 and applied a downward "condition adjustment" of $586. *Id.* The Base Vehicle Value was derived from "the weighted average of the adjusted value of the comparable vehicles" that were listed in the Report. *Id.* ¶ 30. The comparable vehicles were "vehicles in the area" that were "similar to the loss vehicle based on relevant factors" and selected from CCC's "extensive database of vehicles that currently are or recently were available for sale." *Id.* ¶ 31.

The comparable vehicles were, like the subject vehicle, 2011 Cadillac Performance Sedans, each with different mileage and trim levels. *Id.* ¶ 32. The report included a "list price" for each comparable vehicle and then applied adjustments to the list prices across four categories – "Make/Model/Trim," "Options," "Mileage," and "Condition" – to reflect differences in each vehicle. *Id.* ¶¶ 33, 35-37. Within the adjustment categories (except "Condition"), the four

comparable vehicles were evaluated against the Loss Vehicle. *Id.* ¶ 38. A negative adjustment figure indicated that the comparable vehicle was superior to the Loss Vehicle in the given category and reflected the amount by which the comparative vehicle's price must be reduced to yield an accurate retail price valuation for the Loss Vehicle. *Id.* In the "Condition" adjustment category, the comparable vehicles were not directly compared against the Loss Vehicle; instead, this category reflected the degree to which each comparable vehicle's condition was superior or inferior to a similar vehicle with "Normal Wear." *Id.* ¶ 39. A negative adjustment in the "Condition" category meant that the comparable vehicle was superior to a Normal Wear vehicle and the comparable vehicle's retail price was reduced to determine a fair market value of a similar Normal Wear vehicle. *Id.* ¶ 40. A condition adjustment was also applied to the Loss Vehicle's Base Vehicle Value to determine the degree to which its condition differed from a similar vehicle with Normal Wear. *Id.* ¶ 41.

Plaintiff alleges numerous problems with the Report. First, Plaintiff challenges the Report's application of "Condition" adjustments. The Report listed each of the four comparable vehicles with a condition adjustment of negative $1,243, meaning that each comparable vehicle was in better than Normal Wear condition and was worth $1,243 more at retail than if it had been in Normal Wear condition. *Id.* ¶¶ 43, 44. The Report listed the subject vehicle's condition adjustment as negative $586, however, the FAC highlights that this adjustment was applied as a *reduction* in the value of the Loss Vehicle, which indicates that the subject vehicle was worth $586 less than Normal Wear condition.[3] *Id.* ¶¶ 45-46.

---

[3] Neither party addresses why a negative condition adjustment was used to *increase* the value of comparable vehicles but to *reduce* the value of the Loss Vehicle.

Second, Plaintiff's FAC highlights discrepancies in the Report with the subject vehicle. The first comparable vehicle, "Comp 1," was the subject vehicle itself. *Id.* ¶ 49. Despite being the same car, the condition of Comp 1 was listed as $1,243 better than Normal Wear, while the condition of the Loss Vehicle was listed as $586 worse than Normal Wear. *Id.* ¶ 50. Additionally, the option adjustment for Comp 1 reflected that its options were $127 more valuable than the Loss Vehicle's options. *Id.* ¶ 51. Although Plaintiff was listed as the selling dealership of Comp 1, Defendants never contacted Plaintiff to inquire about the vehicle's condition, nor visited the dealership to inspect the car, prior to adding the car to their database to be used as a comparable vehicle. *Id.* ¶¶ 52-53.

Third, Plaintiff alleges that there were issues with the other comparable vehicles included in the Report. *Id.* ¶¶ 54-58. Although the condition of the second comparable vehicle, "Comp 2" was listed to be $1,243 better than Normal Wear, the vehicle's Carfax history report showed it sustained damage to the majority of its exterior in January 2016. *Id.* ¶ 55. Under industry standards, the damage reflected in the vehicle history report would preclude representing that the vehicle's condition was better than Normal Wear. *Id.* ¶ 56. The third comparable vehicle, "Comp 3," was listed as an all-wheel drive vehicle; however, its vehicle identification number coding indicated that it is a rear wheel drive vehicle. *Id.* ¶ 58. Plaintiff alleges that the subject vehicle was found to have a lower Base Vehicle Value as a result of these errors. *Id.* ¶ 59. Plaintiff further alleges that Defendants did not inspect the comparable vehicles listed in the Report, nor did they communicate with the sellers about the vehicles' "Make/Model/Trim" or "Options." *Id.* ¶¶ 60, 64-65.

Fourth, Plaintiff challenges the Report's findings as to the condition of the subject vehicle. The Report determined that "the condition of key components" of the subject vehicle prior to its

5

loss rendered it worth $586 less than the Base Vehicle Value. *Id.* ¶ 66. The subject vehicle's seats and exterior trim were listed as exhibiting Major Wear; all other components of the vehicle exhibited Normal Wear. *Id.* ¶ 67. Neither Normal Wear nor Major Wear were explained or defined by the Report, and the Report did not mention any rating superior to Normal Wear. *Id.* ¶ 68. Many of the subject vehicle's components that Defendants represented as exhibiting Normal Wear – including the exterior trim – had no discernable wear at all. *Id.* ¶ 69.

Based on the Report, Defendants represented that the subject vehicle's retail value was $7,671 plus sales tax and made a claim settlement offer to Plaintiff in that amount. *Id.* ¶ 70. Plaintiff alleges that the actual value of the car was at least $9,998 and, at the time of the offer, it would have been impossible for Plaintiff to purchase a comparable vehicle for $7,671. *Id.* ¶¶ 71-72.

Salit emailed Hubert and his manager at Liberty Mutual, Shane Wyckoff, on March 2, 2018 to object to the subject vehicle's purported valuation, discuss the issues in the Report, and seek clarification about the $1,243 condition adjustment applied to each comparable vehicle. *Id.* ¶¶ 75-76. Wyckoff responded on March 5, 2018 and stated that he would "need to take a deeper dive into this" and would follow up the next day. *Id.* ¶ 77. Hubert telephoned Salit on March 6, 2018 and explained that the subject vehicle's valuation was increased to $8,412 plus tax. *Id.* ¶ 78. Hubert did not discuss the other questions and objections raised in Salit's emails. *Id.*

Salit objected to the revised valuation and requested a copy of the revised evaluation report ("Revised Report"), which Wyckoff provided. *Id.* ¶¶ 79-80. Wyckoff advised that if Plaintiff disagreed with the evaluation, it should consider other options like pursing a claim through his own insurance company (a first-party claim), or instructing its attorney to reach out to Hubert. *Id.* ¶ 80.

The Revised Report changed the condition of the subject vehicle's exterior trim from Major Wear to Normal Wear and replaced the four comparable vehicles with different Cadillac CTS Performance Sedans; it otherwise failed to address the discrepancies noted in Salit's March 2, 2018 email. *Id.* ¶ 73, 83. The Revised Report also applied a uniform condition adjustment to all the comparable vehicles – this time, the amount was $1,186. *Id.* ¶ 84.

Plaintiff's counsel emailed Wyckoff and Hubert on March 13, 2018 seeking information on (1) the procedure for initiating an appeal within Liberty Mutual's internal appeal panel; and (2) an explanation for the uniform downward condition adjustment of the comparable vehicles used in both valuation reports. *Id.* ¶ 86. Plaintiff's counsel sent follow up emails requesting this information on March 13 and 15, 2018, and November 12, 2018, after receiving no response. *Id.* ¶ 87-88. Wyckoff responded via email on November 14, 2018. *Id.* ¶ 89. The email failed to explain the procedure for obtaining an internal appeal. *Id.* ¶ 90. It also did not address Plaintiff's question about the uniform condition adjustments for comparable vehicles and stated that the information was proprietary and could not be provided. *Id.* ¶ 91. Plaintiff's counsel sent a final email on November 14, 2018, which asked that Plaintiff's request for information on the revised valuation be directed to Liberty Mutual's legal department, but no further communication from Liberty Mutual was sent. *Id.* ¶¶ 92-93.

Plaintiff filed a Complaint against Defendants on August 15, 2019, in New Jersey Superior Court. D.E. 1-1. Defendants timely removed the action pursuant to 28 U.S.C. §§ 1441, 1446, and 1453. D.E. 1. On October 2, 2019, Plaintiffs filed the FAC. D.E. 10. The FAC alleges four counts against all Defendants on behalf of a purported class: (I) violations of New Jersey's Racketeer Influenced and Corrupt Organizations Act (NJRICO); (II) violations of New Jersey's Consumer Fraud Act (NJCFA); (III) common law misrepresentation; and (IV) civil conspiracy.

FAC ¶¶ 108-135.  On November 8, 2019, Defendants filed their motions to dismiss all counts.  D.E. 23, 24.

## II. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]"  To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims."  *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim.  *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

**III.    ANALYSIS**

Plaintiff first brings a claim against all Defendants for violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act (NJRICO), N.J. Stat. Ann. § 2C:41-1 *et seq.* FAC ¶ 108. Under NJRICO, it is "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in or activities of which affect trade or commerce." N.J. Stat. Ann. § 2C:41-2(c); *State v. Ball*, 661 A.2d 251, 257-58 (N.J. 1995). A NJRICO claim is comprised of the following elements:

> "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity."

*State v. Ball*, 632 A.2d 1222, 1236 (N.J. Super. Ct. App. Div. 1993), *aff'd* 661 A.2d 251 (N.J. 1995). Additionally, a plaintiff must satisfy a sixth element – a statutory standing requirement – by showing that "plaintiff's harm was proximately caused by the RICO predicate acts alleged, *i.e.* that there was a direct relationship between plaintiff's injury and defendant's conduct." *Interchange State Bank v. Veglia*, 668 A.2d 465, 472 (N.J. Super. Ct. App. Div. 1995) (quotation omitted); *see also Southward v. Elizabeth Bd. of Educ.*, No. 15-3699, 2017 WL 4392038, at *12 (D.N.J. Oct. 2, 2017).

"NJ RICO confers a private right of action on '[a]ny person damaged in his business or property by reason of a violation of' NJ RICO." *Edgewood Props., Inc. v. J&L Mgmt. Corp.*, No. 8-774, 2009 U.S. Dist. LEXIS 140186, *22-23 (D.N.J. Jan. 27, 2009) (quoting N.J.S.A. § 2C:41-4(c)). "The Supreme Court has stated that 'the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the

9

violation [of RICO].'" *Maio v. Aetna Inc.*, 221 F.3d 472 (3d Cir. 2000) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).[4] In the Third Circuit, a NJRICO claim "requires a party to show standing through an injury that is 'a concrete financial loss and not mere injury to a valuable intangible property interest.'" *Myrus Hack, LLC v. McDonald's Corp.*, No. 5-2700, 2009 U.S. Dist. LEXIS 25765, *23 (D.N.J. Mar. 30, 2009) (quoting *Maio*, 221 F.3d at 483).

Second, Plaintiff brings a claim under the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 *et seq.*, against all Defendants. FAC ¶ 117. The NJCFA prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise or real estate." N.J. Stat. Ann. § 56:8-2. To state a claim under NJCFA, "a plaintiff must allege '1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between' the two." *Hassler v. Sovereign Bank*, 374 Fed. App'x 341, 343 (3d Cir. 2010) (quoting *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009)).

"To demonstrate an ascertainable loss, the plaintiff must establish an 'actual loss,' that is 'quantifiable or measurable,' or 'real and demonstrable,' as opposed to 'hypothetical or illusory' or 'speculative.'" *Dicuio v. Brother Int'l Corp.*, No. 11-1447, 2012 U.S. Dis. LEXIS 112047, *18 (D.N.J. Aug. 9, 2012) (quoting *Thiedemann*, 872 A.2d at 792, 795). The New Jersey Supreme

---

[4] Although this case is interpreting the federal Racketeer Influenced and Corrupt Organizations Act (RICO), the New Jersey Supreme Court has explained that NJRICO parallels the federal RICO and "because the federal statute served as an initial model for our own, [courts] heed federal legislative history and case law in construing [New Jersey's] statute." *Ball*, 661 A.2d at 258.

Court has explained that "[i]n cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 792 (N.J. 2005). The loss "need not yet have been experienced as an out-of-pocket loss to the plaintiff." *Id.* at 793. "An 'estimate of damages, calculated within a reasonable degree of certainty' will suffice to demonstrate an ascertainable loss." *Id.* (quoting *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 464 (N.J. 1994)).

In *Perkins v. DaimlerChrysler Corp.*, a plaintiff brought a claim under the NJCFA and alleged she was defrauded when purchasing her Jeep because the car's manufacturer "did not reveal that the vehicle was manufactured with a [part] allegedly susceptible to cracking and premature failing, and unlikely to last for 250,000 miles, which, [the] plaintiff claim[ed] without support, [wa]s the industry lifetime standard for such a part." 890 A.2d. 997, 998-999 (N.J. Super. Ct. App. Div. 2006). The "allegedly substandard part did not fail or require repair or replacement within the [vehicle's] warranty period." *Id.* at 999. On the issue of ascertainable loss, the Appellate Division noted that the complaint did not allege "that plaintiff has incurred any out-of-pocket expenses or other actual loss as a result of this condition of the vehicle," but determined that "a fair interpretation of plaintiff's claim of an ascertainable loss is that her Jeep has a reduced resale value" even though the part remained undamaged. *Id.* at 1000. Relying on *Thiedemann*, the Appellate Division found that the plaintiff sufficiently pled an ascertainable loss to withstand a motion to dismiss. *Id.* at 1000, 1003. It explained that

> plaintiff alleged in her complaint that she suffered an ascertainable loss. She did not allege the nature of that loss, nor was she so required at that stage. Defendant's motion to dismiss . . . did not require, in order to avoid dismissal, that plaintiff provide evidential material to rebut defendant's contention that she had not sustained an ascertainable loss.

11

*Id.* at 1003-04.

As for the causal relationship element, "[w]hen the basis of the reasonable expectation about the product is a misrepresentation made by the seller, the [NJCFA] requires a direct causal connection between the misrepresentation and the plaintiff's defeated expectations about the product." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d. 84, 100 (D.N.J. 2011). The plaintiff must "plead that the misrepresentation was made to him or her individually"; "misrepresentations made to the public generally but not the plaintiff do not bear a sufficient nexus." *Id.*

Plaintiff also brings a claim against all Defendants for common law misrepresentation. Common law fraud or misrepresentation consists of five elements: "'(1) a material misrepresentation of the presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) a reasonable reliance thereon by the other person; and (5) resultant damages.'" *Bonnieview Homeowners Ass'n, LLC v. Woodmont Builders, L.L.C.*, 655 F. Supp. 2d 473, 516 (D.N.J. 2009) (quoting *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)).

Two essential elements are shared across NJRICO, NJCFA, and common law misrepresentation claims: (1) causation or reliance; and (2) damages. To recap, for a plaintiff to have standing to assert an NJRICO claim, he must show proximate cause – *i.e.*, that he was harmed as a result of the defendant's conduct; a NJCFA claim requires a plaintiff to allege an ascertainable loss and a causal connection between that loss and the defendant's unlawful conduct; and a common law misrepresentation claim requires a plaintiff to plead that he suffered damages as a result of his reliance on the defendant's false statement.

Plaintiff has failed to plausibly plead these required elements. Plaintiff does not allege that it relied on Defendants' alleged misrepresentations. In fact, unlike "ordinary consumers," Plaintiff

pled that it had "knowledge to detect the fraudulent nature of the Defendants' 'condition adjustments.'" FAC ¶ 13. Additionally, Plaintiff does not allege that it accepted Defendants' settlement offer and therefore has not plausibly pled that he suffered any injury or damages. Plaintiff also does not allege that it is entitled to some form of statutory damages. The Court finds that in the absence of adequately pled causation and damages, Plaintiff's NJRICO claim fails. Plaintiff's common law misrepresentation claim fails because the FAC expressly demonstrates that Plaintiff did not rely on Defendants' statements.

Plaintiff's NJCFA claim also fails. Under New Jersey law, an ascertainable loss can be shown through an "out-of-pocket loss or a demonstration of loss in value." *Thiedemann*, 872 A.2d at 792. Here, Plaintiff has not alleged an out-of-pocket loss. Plaintiff has also failed to plausibly plead a loss in the value of the subject vehicle. The FAC alleges that, prior to the accident, the subject vehicle was worth $9,998 at a minimum. FAC ¶ 71. Plaintiff claims that Defendants' settlement offer was too low based on certain faulty and unexplained adjustments as well as inappropriately priced comparable vehicles. But nowhere in the FAC does Plaintiff allege that, as a result, it actually accepted an improperly lower amount for the subject vehicle. Nor is this case analogous to *Perkins* in which the plaintiff had not yet suffered an out-of-pocket loss but did sufficiently allege a reduction in value to her vehicle.

Plaintiff's fourth claim is for civil conspiracy. "In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2003) (quoting *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993). "[T]he 'gist' of the

13

claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'" *Id.* (quoting *Morgan*, 633 A.2d at 998). "Under New Jersey law, a claim for civil conspiracy cannot survive without a viable underlying tort." *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 533 (D.N.J. 2011). In light of the dismissal of the claim for common law misrepresentation, Plaintiff's civil conspiracy claim cannot stand.

Defendants' motions to dismiss are granted without prejudice.

### IV.    OTHER DEFICIENCIES IN THE PLEADING

The FAC also suffers from additional deficiencies.

First, to sufficiently plead a NJRICO claim, a plaintiff must allege that a defendant engaged in a "pattern of racketeering," which is statutorily defined as engaging in two or more predicate acts under NJRICO. N.J. Stat. Ann. § 2C:41-1(d)(1). Here, Plaintiff has only alleged one predicate act – the alleged fraud in handling Plaintiff's third-party insurance claim, specifically as to the Report. Plaintiff argues that it has adequately pled a pattern of racketeering because the FAC "alleges the existence of a state-wide Class of vehicle owners, all of whom were victimized by the same scheme." Pl. Opp. LM at 8. The conclusory assertion as to the class is insufficient to find that Plaintiff plausibly pled a pattern of racketeering under NJRICO.

Second, the Court notes that some allegations in Plaintiff's FAC rely on impermissible group pleadings and allege that "Defendants" engaged in unlawful conduct. For example, Plaintiff alleges that "Defendants' valuation reports have, by design, routinely misrepresented and understated the replacement value of claimants' totaled vehicles," FAC ¶ 2 and "[t]he Defendants' uniform representations about the condition of the "comparable vehicles" in the February 23, 2018, Market Valuation Report were false and misleading." FAC ¶ 47. Mere "conclusory allegations against [d]efendants as a group" which "fail to allege the personal involvement of any [d]efendant"

14

are insufficient to survive a motion to dismiss. *Galicki v. New Jersey*, No. 14-169, 2015 U.S. Dist. LEXIS 84365, at *8 (D.N.J. June 29, 2015). Plaintiff must allege facts that "establish each individual [d]efendant's liability for the misconduct alleged." *Id.* When different defendants are named in a complaint, plaintiff cannot refer to all defendants "who occupied different positions and presumably had distinct roles in the alleged misconduct" without specifying "*which* [d]efendants engaged in what wrongful conduct." *Falat v. County of Hunterdon*, No. 12-6804, 2013 U.S. Dist. LEXIS, at *12 (D.N.J. Mar. 19, 2013) (emphasis in original). Otherwise, a complaint that contains "impermissibly vague group pleading" will be dismissed. *Id.* at *11.

The FAC plausibly indicates Liberty Mutual's conduct;[5] however, it fails to plausibly indicate what was *improper* about that conduct. While Plaintiff alleges issues and inconsistencies within the Report, it does not specify how Liberty Mutual's use of the Report amounted to an unlawful act. Under New Jersey law, insurers are permitted to use a "computerized database approved by the Commissioner" to value total loss claims, so long as the database meets certain requirements. N.J. Admin. Code § 11:3-10.4(a)(3). CCC is an approved database. State of New Jersey, Department of Banking & Insurance, *Filing an Auto Damage Claim with Another Insurance Company*, https://www.state.nj.us/dobi/ins_ombudsman/wysk2.htm#16. Thus, it is insufficient for Plaintiff to merely allege that Liberty Mutual used CCC's Report – Plaintiff must also plausibly show that Liberty Mutual engaged in culpable conduct when doing so.

---

[5] The FAC, however, lumps Defendant Liberty Mutual Group, Inc. together with Defendant Liberty Mutual Home and Auto Service LLC and refers to them collectively as "Liberty Mutual." This is insufficient without further factual allegations demonstrating, for example, that the two entities should be considered together or that one is responsible for the culpable conduct of the other.

Plaintiff alleges that the Carfax vehicle history reports for the comparable vehicles revealed that the Report contained errors, *see, e.g.* FAC ¶¶ 11, 55, and that Defendants never inspected the comparable vehicles or communicated with dealerships to confirm the attributes of the vehicles, FAC ¶ 60.  However, these allegations fall short of plausibly pleading unlawful conduct on the part of Liberty Mutual.  At best, these allegations suggest that Liberty Mutual did not engage in due diligence.[6]  But the FAC falls short of alleging that Liberty Mutual knew[7] that information contained within the Report was incorrect or that Liberty Mutual manipulated the data.  Additionally, once Plaintiff alerted Liberty Mutual of issues in the Report, Liberty Mutual increased its settlement offer.[8]

### V.   CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are **GRANTED**.  The dismissal is without prejudice.  Plaintiff has thirty (30) days to file a second amended complaint that cured the deficiencies notes herein.  If Plaintiff does not, then this matter will be dismissed with prejudice.  An appropriate Order accompanies this Opinion.

Dated: September 28, 2020

_____
John Michael Vazquez, U.S.D.J.

---

[6] Assuming that Liberty Mutual did not perform due diligence, as implied by Plaintiff, the next question to be addressed is whether Liberty Mutual was required (or had a duty) to do so in light of the fact that it was using an expressly approved database.

[7] The Court uses the word "knew" solely by way of example.  The Court is not finding that other mental states would be insufficient.

[8] In light of the foregoing analysis, the Court does not reach the additional arguments raised by Defendants.