# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SALIT AUTO SALES, INC. d/b/a SALIT AUTO SALES, on behalf of itself and others similarly situated,<br><br>        Plaintiff,<br><br> vs.<br><br>CCC INFORMATION SERVICES INC., LIBERTY MUTUAL GROUP INC., and AUTO SERVICES LLC, d/b/a LIBERTY MUTUAL FIRE INSURANCE COMPANY AND WAUSAU UNDERWRITERS INSURANCE COMPANY,<br><br>        Defendants. | Case No. 2:19-CV-18107-JMV-MF<br><br><br><br>Motion Day: February 1, 2021 |

---

## BRIEF IN SUPPORT OF CCC INFORMATION SERVICES INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 9(b), 12(b)(1) AND 12(b)(6)

---

**ANSA ASSUNCAO LLP**
(A Pennsylvania Limited Liability Partnership)
100 Matawan Road, Suite 410
Matawan, NJ  07747
Telephone:  (732) 993-9850

**LATHAM & WATKINS LLP**
555 11th Street NW, Suite 1000
Washington, DC  20004
Telephone:  (202) 637-2200

*Attorneys for Defendant CCC Information Services Inc.*

Dated:  December 11, 2020

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND .................................................................................................2

     A.    Factual Background ................................................................................2

           1.    CCC's Valuation Methodology ..................................................3
           2.    Plaintiff's Objections to Liberty Mutual's Settlement Offer ......................5

     B.    Plaintiff's Complaint and Defendants' Motions to Dismiss ...................................7

     C.    Plaintiff's Second Amended Complaint ...................................................8

III.   LEGAL STANDARD...........................................................................................9

IV.   ARGUMENT .....................................................................................................10

     A.    The SAC Does Not Plead Essential Elements of NJRICO and CFA Claims........10

           1.    Plaintiff's SAC Does Not Cure Plaintiff's Failure To Plead Injury ..........10
           2.    Plaintiff's SAC Does Not Cure The FAC's Failure To Plead Causation.............................................................................13
           3.    CCC's Valuation Opinion Cannot Support A Claim for Fraud Under CFA Or Any NJRICO Predicate Act, Including Deceptive Business Practices, Theft By Deception, And Mail And Wire Fraud ..........................................................................................15
           4.    Plaintiff Does Not And Cannot Allege That CCC Participated In A Commercial Transaction Protected By CFA ...............................19

     B.    Plaintiff Fails to Establish Ripeness Or An Injury Fairly Traceable To CCC...............................................................................................22

V.    CONCLUSION..................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*A.S. v. Harrison Twp. Bd. of Educ.*,
66 F. Supp. 3d 539 (D.N.J. 2014) ............................................................25

*In re Adolor Corp. Secs. Litig.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) ........................................................17

*Arc Networks, Inc. v. Gold Phone Card Co., Inc.*,
333 N.J. Super. 587 (Law. Div. 2000) ......................................................20

*Argabright v. Rheem Mfg. Co.*,
201 F. Supp. 3d 578 (D.N.J. 2016) ...........................................................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................9

*Barows v. Chase Manhattan Mortg. Corp.*,
465 F. Supp. 2d 347 (D.N.J. 2006) ...........................................................16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................9

*Bostrom v. N.J. Div. of Youth & Family Servs.*,
969 F. Supp. 2d 393 (D.N.J. 2013) ...........................................................25

*Bracco Diagnostics Inc. v. Bergen Brunswig Drug Co.*,
226 F. Supp. 2d 557 (D.N.J. 2002) ...........................................................20

*Cetel v. Kirwan Fin. Grp., Inc.*,
460 F.3d 494 (3d Cir. 2006) ................................................................19, 20

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .....................................................................................25

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................................22

*Cowell v. Palmer Twp.*,
263 F.3d 286 (3d Cir. 2001) .......................................................................23

*Crete v. Resort Condos. Int'l, LLC*,
No. 09-cv-5665, 2011 WL 666039 (D.N.J. Feb. 14, 2011) .......................9

*D'Agostino v. Maldonado*,
   216 N.J. 168 (2013) ......................................................................................13, 22

*Daibo v. Kirsch*,
   316 N.J. Super. 580 (App. Div. 1998) ...............................................................15, 17

*Dewey v. Volkswagen AG*,
   558 F. Supp. 2d 505 (D.N.J. 2008) ...........................................................................9

*Dicuio v. Brother Int'l Corp.*,
   No. 11-1447, 2012 WL 3278917 (D.N.J. Aug. 9, 2012) .......................................10

*DiSalvatore v. Aetna Cas. & Sur. Co.*,
   624 F. Supp. 541 (D.N.J. 1986) ................................................................................2

*Dist. 1199P Health & Welfare Plan*,
   784 F. Supp. 2d 508 (D.N.J. 2011) ......................................................................14, 18

*Donnelly v. Option One Mortg. Corp.*,
   No. 11-cv-7019, 2014 WL 1266209 (D.N.J. Mar. 26, 2014) .............................9, 10

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
   232 F.3d 173 (3d Cir. 2000) ....................................................................................19

*Edelman v. Croonquist*,
   No. 09-cv-1938, 2010 WL 1816180 (D.N.J. May 4, 2010) ...................................25

*Finkelman v. Nat'l Football League*,
   810 F.3d 187 (3d Cir. 2016) ....................................................................................24

*Gasoline Sales, Inc. v. Aero Oil Co.*,
   39 F.3d 70 (3d. Cir. 1994) .......................................................................................10

*Johnson v. GEICO Cas. Co.*,
   673 F. Supp. 2d 244 (D. Del. 2009) ....................................................................24, 25

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
   266 F.3d 164 (3d Cir. 2001) ....................................................................................22

*Koronthaly v. L'Oreal USA, Inc.*,
   No. 07-cv-5588, 2008 WL 2938045 (D.N.J. July 29, 2008) ..................................22

*Kowalsky v. Deutsche Bank Nat'l Tr. Co.*,
   No. 14-cv-07856, 2015 WL 5770523 (D.N.J. Sept. 30, 2015) ..............................10

*Levy v. Edmund Buick-Pontiac, Ltd.*,
   270 N.J. Super. 563 (Law Div. 1993) .....................................................................21

*Lewis v. Casey,*
    518 U.S. 343 (1996)...................................................................................................22

*Lewis v. Gov't Empls. Ins. Co.,*
    1:18-cv-05111, 2019 WL 1198910 (D.N.J. March. 14, 2019) ...................................14, 17, 18

*Mango v. Pierce-Coombs,*
    370 N.J. Super. 239 (App. Div. 2004) ....................................................................16

*McNair v. Synapse Grp. Inc.,*
    672 F.3d 213 (3d Cir. 2012)....................................................................................25

*Mickens v. Ford Motor Co.,*
    900 F. Supp. 2d 427 (D.N.J. 2012) ........................................................................14

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)................................................................................................22

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC,*
    No. 3:18-cv-2211, 2019 WL 1418129 (D.N.J. Mar. 29, 2019) ...............................21

*Myrus Hack, LLC v. McDonald's Corp.,*
    No. 5-2700, 2009 WL 872176 (D.N.J. Mar. 30, 2009) ..........................................10

*Papergraphics Int'l, Inc. v. Correa,*
    389 N.J. Super. 8 (App. Div. 2006) .................................................................19, 21

*Polanco v. Omnicell, Inc.,*
    988 F. Supp. 2d 451 (D.N.J. 2013) ........................................................................25

*Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.,*
    311 F.3d 226 (3d Cir. 2006)......................................................................2, 23, 24, 25

*Rapaport v. Weingast & Assoc. Inc.,*
    859 F. Supp. 2d 706 (DNJ April 30, 2012)............................................................12

*Reilly v. Ceridian Corp.,*
    664 F.3d 38 (3d Cir. 2011)......................................................................................25

*S. Broward Hosp. Dist. v. MedQuist Inc.,*
    516 F. Supp. 2d 370 (D.N.J. 2007) ........................................................................20

*SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.,*
    934 F. Supp. 2d 516 (E.D.N.Y. 2013), *aff'd,* 548 F. App'x 741 (2d Cir. 2014)...............23, 24

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action,*
    678 F.3d 235 (3d Cir. 2012).............................................................................24, 25

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. Jul. 10, 2009) .........................................10, 11

*U.S. ex rel. Schumann v. Astrazeneca Pharms. L.P.*,
769 F.3d 837 (3d Cir. 2014) ...............................................................................................10

*Slimm v. Bank of Am. Corp.*,
No. 12-cv-5846, 2013 WL 1867035 (D.N.J. May 2, 2013) ....................................................17

*Standard Fire Ins. Co. v. MTU Detroit Diesel, Inc.*,
No. 07-cv-3827, 2009 WL 2568199 (D.N.J. Aug. 13, 2009) .................................................21

*State v. Cox*,
150 N.J. Super. 599 (Law Div. 1977), *aff'd*, 160 N.J. Super. 28 (App. Div.
1978) ...........................................................................................................................16

*State v. Hancock*,
208 N.J. Super. 737 (N.J. Super. Law Div. 1985) ...............................................................13

*Stella v. Dean Witter Reynolds, Inc.*,
241 N.J. Super. 55 (App. Div. 1990) ...................................................................................21

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)................................................................................................10

*Texas v. United States*,
523 U.S. 296 (1998)............................................................................................................22

*Thiedemann v. Mercedes-Benz USA, LLC*,
183 N.J. 234 (2005) ....................................................................................................10, 11

*United States v. Hedaithy*,
392 F.3d 580 (3d Cir. 2004)................................................................................................16

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,
Inc.*,
454 U.S. 464 (1982)............................................................................................................22

*Waxman v. Cliffs Nat. Res. Inc.*,
222 F. Supp. 3d 281 (S.D.N.Y. 2016)..................................................................................23

*Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*,
957 F. Supp. 562 (D.N.J. 1997) ..........................................................................................20

*Wright v. Westside Nursery*,
787 P.2d, 508 (Utah Ct. App. 1990) .............................................................................15, 17

*Zanger v. Bank of Am., N.A.*,
No. 10-cv-2480, 2011 WL 3501867 (D.N.J. Aug. 10, 2011) ................................16

## STATUTES

N.J.S.A. § 56:8-1(c) ..........................................................................................20

N.J.S.A. § 56:8-2 ..............................................................................................15

N.J.S.A. § 56:8 *et seq.* ......................................................................................19

N.J. Stat. Ann. § 2C:41-1(d)(1) ........................................................................19

## RULES

Fed. R. Civ. P. 9(b) ..........................................................................9, 10, 16, 18

Fed. R. Civ. P. 12(b)(1) ..............................................................................22, 25

## REGULATIONS

N.J.A.C. § 11:2-17.8(g) .............................................................................12, 13

N.J.A.C. § 11:2-17.10(a)(1) ..............................................................................13

## OTHER AUTHORITIES

N.J. Dep't of Banking & Insurance, Filing an Auto Damage Claim with Another
Insurance Company (click on Question 16),
https://www.state.nj.us/dobi/ins_ombudsman/wysk2.htm (last visited Nov. 5,
2019) ..........................................................................................................3

## I.        INTRODUCTION

The Second Amended Complaint ("SAC") (Dkt. 37)—Plaintiff's *third* bite at the apple—makes only cosmetic changes and fails to cure any of the fundamental defects this Court identified in its Opinion dismissing the First Amended Complaint ("FAC") ("Dismissal Opinion," Dkt. 35). Nothing in the SAC—neither the new superficial allegations nor Plaintiff's attaching to the pleading exhibits that were before the Court on Defendants' original motions to dismiss—changes the fact that, among other things, Plaintiff has not alleged that it experienced any cognizable injury, let alone one caused by CCC Information Services Inc. ("CCC"); has not and cannot plead reliance; and has not and cannot plead other requisite elements of its claims against CCC under the New Jersey Racketeering and Organized Crime Act ("NJRICO") and the New Jersey Consumer Fraud Act ("CFA").

While Plaintiff, a used-car dealer, claims it was defrauded by the valuation reports provided by CCC to Defendant Liberty Mutual Group. Inc. and Wausau Underwriters Insurance Company ("Wausau") (improperly named as a "d/b/a" of Liberty Mutual but collectively referred to here as "Liberty Mutual") to assist Liberty Mutual in attempting to settle Plaintiff's third-party property damage claim, Plaintiff concedes that it was *not* deceived or defrauded by the allegedly fraudulent valuations, and that it *rejected* Liberty Mutual's settlement offer and CCC's valuations.  Indeed, Plaintiff concedes that, as a used car dealer, it has unique personal knowledge of vehicle valuations that allowed it to avoid falling prey to the same deception it alleges.  Those facts, which were fatal to the FAC, cannot be cured by *any* pleading amendment and also doom the SAC.

In fact, not only did Plaintiff reject CCC's valuation (and Liberty Mutual's associated settlement offer), but Plaintiff had no interaction with CCC whatsoever.  CCC provided its valuations opinions to Liberty Mutual at Liberty Mutual's request, in order to fulfill CCC's contractual obligations to Liberty Mutual—*not* to Plaintiff.  And Liberty Mutual sought those

opinions not because it had an insurer-insured relationship with Plaintiff, but because Liberty Mutual was attempting to resolve Plaintiff's third-party property damage claim. Thus, Plaintiff was at best a stranger to CCC, and CCC could not have deceived or damaged Plaintiff in any way.

These essential facts, unchanged in the SAC, preclude any showing of causation or injury. Plaintiff's claims cannot be salvaged, and dismissal of the SAC with prejudice is appropriate.

## II.    BACKGROUND

### A.    Factual Background

Plaintiff is a used car dealership. *See* SAC ¶ 16. It alleges that a vehicle it owns was damaged on January 21, 2018, in an accident allegedly caused by another driver, non-party Maria Corbet, who was an insured of Liberty Mutual. *See id.* ¶¶ 20-23. On or about February 6, 2018, Plaintiff submitted a third-party property damage claim to Ms. Corbet's insurer, Liberty Mutual. *See id.* ¶ 23. Plaintiff chose to submit its claim to Liberty Mutual, instead of submitting a claim to its own insurance company or pursuing legal action against Ms. Corbet directly. *See id.* ¶¶ 23, 26 & n.1. In so doing, Plaintiff had a different relationship with Liberty Mutual than the policyholder, Ms. Corbet, as Plaintiff had no contractual relationship with Liberty Mutual. *See, e.g.*, *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2006) ("The primary aim of third-party insurance is to defend and indemnify insureds against liability for claims made against them as a result of their own conduct. . . . In the third-party setting, the insurer and insured may generally be considered allies . . . ."); *DiSalvatore v. Aetna Cas. & Sur. Co.*, 624 F. Supp. 541, 544 (D.N.J. 1986) (noting that an "insured and his insurer are in an adversarial position in first-party actions, as contrasted with the relationship in cases involving third-party claims").[1]

---

[1] Unless stated otherwise, all emphasis is supplied, and all internal citations and quotations are omitted from all quoted material herein.

Upon receiving the third-party claim, Liberty Mutual determined that Plaintiff's vehicle was a "total loss," and on February 23, 2018, it presented a settlement offer to Plaintiff that included an estimate of the pre-accident cash value of the vehicle. *See* SAC ¶¶ 25–27, 29 & Exs. A, D at 1. To inform its settlement offer, Liberty Mutual sought a valuation of Plaintiff's vehicle from CCC, a company headquartered outside of New Jersey (SAC ¶ 18) which provides vehicle valuations to assist insurance companies in adjusting claims for vehicles that have been declared a total loss. *See id.* ¶¶ 18, 29. CCC, in turn, provided Liberty Mutual the valuation report reflecting CCC's "opinion as to the value of the loss vehicle," and outlining the methodology employed to reach that opinion of value. *See id.* Ex. A at 1–2.[2]

### 1.   CCC's Valuation Methodology

As described in CCC's report, CCC's valuation looks at the loss vehicle, including its mileage, equipment, and condition based on an evaluation by Liberty Mutual, to determine the value of the vehicle before the accident. *See id.* Ex. A, at 2. CCC then considers the value of comparable vehicles that are currently or recently available for sale in or near the zip code of the loss vehicle, including both "vehicles that CCC employees have physically inspected, as well as vehicles advertised for sale by dealerships or private parties."[3] *Id.*

Specifically, after identifying the comparable vehicles, CCC applies adjustments to the value of the comparable vehicles reflecting the difference between the loss vehicle and the

---

[2] As this Court recognized, Dismissal Opinion at 15, the New Jersey Commissioner of Banking and Insurance has approved CCC for use by insurance companies in settling total loss claims. *See* N.J. Dep't of Banking & Insurance, Filing an Auto Damage Claim with Another Insurance Company, https://www.state.nj.us/dobi/ins_ombudsman/wysk2.htm#16 (last visited Dec. 11, 2020).

[3] The same methodology is explained in both the Exhibits A and E to the SAC.

comparable vehicles in the following categories: (i) make/model/trim, (ii) options, (iii) mileage.[4]
*See id.* at 7–8.  When a comparable vehicle is superior to the loss vehicle in any of these categories,
CCC deducts from the comparable vehicle's list price to account for the difference.  *See id.*  CCC
also adjusts for the condition of the comparable and loss vehicles, but does so in a two-step process
distinct from the other adjustments, which is described in the valuation report.  *Id.* at 2, 7–8.

Plaintiff's dispute focuses exclusively on the first half of the condition adjustment process.
To adjust for condition, i.e., to allow for an apples-to-apples comparison between vehicles, CCC
first "sets [each] comparable vehicle to Normal Wear condition, which the loss vehicle is also
compared to in the Vehicle Condition section [of the report]."  *Id.* at 7–8.  In the case of comparable
vehicles listed for sale by private dealers, those vehicles are presumed to be in better than Normal
Wear condition, so the price of each dealer-listed comparable vehicle is reduced for comparison
purposes.[5]  *See id.*  By making this condition adjustment, along with separate adjustments for

---

[4] Plaintiff does not dispute the validity of these adjustments.

[5] In the Dismissal Opinion, the Court expressed confusion as to why a condition adjustment would
positively affect value of comparable vehicles, while reducing the value of the loss vehicle.  *See*
Dismissal Opinion at 4 fn. 3.  CCC provides this explanation based on its valuation report in
response.

As with make/model/trim, options, and mileage, the first half of the condition adjustment
*reduces* the value of the comparable vehicle where the comparable is believed to be superior to the
loss vehicle.  Because the first half of the condition adjustment focuses only on the difference
between private dealer condition and Normal Wear condition (and having separately adjusted all
other differences), each comparable vehicle value is reduced by the same amount, contrary to
Plaintiff's allegation that identical condition adjustments must imply fraud.  FAC ¶ 3.

The loss vehicle receives a condition adjustment as well, either positive or negative, for
aspects of the vehicle that are in better or worse condition than Normal Wear condition.

Therefore, comparable vehicles may receive a negative condition adjustment in order to
account for the difference between the comparable vehicle's superior private dealer condition and
Normal Wear condition, and loss vehicles can receive a negative condition adjustment to account
for differences between Normal Wear condition and the inferior actual condition of the loss
vehicle, depending on the actual reported condition of the loss vehicle.

make/model/trim, options, and mileage, CCC identifies the Adjusted Comparable Value for each comparable vehicle, which CCC uses to generate a Base Vehicle Value through weighted averaging. *Id.* at 2. The Base Vehicle Value is tailored to the specific characteristics of the loss vehicle, *except* to the extent that the loss vehicle may actually be in better or worse than Normal Wear condition.

In the second step of the condition adjustment, CCC makes "dollar adjustments" to reflect the condition of the loss vehicle—based on information reported by Liberty Mutual to CCC—"as compared to Normal Wear." *Id.* at 6. Where a given component of a loss vehicle is in worse than Normal Wear condition, the adjustment made in this second step is negative, and where a given component of a loss vehicle is in better than Normal Wear condition, the adjustment is positive. *See id.* These condition adjustments are totaled and applied to the Base Vehicle Value, resulting in the final Adjusted Vehicle Value. *See id.* at 1.

### 2. Plaintiff's Objections to Liberty Mutual's Settlement Offer

On March 2, 2018, Plaintiff rejected Liberty Mutual's settlement offer, contending that it was too low. *See* SAC ¶¶ 75–76 & Ex. D. Plaintiff alleges that it knew the offer was low because Plaintiff is a used car dealership, understood the condition and value of its vehicle, and thus had the "opportunity" and "knowledge to detect the" allegedly "fraudulent nature of CCC's 'condition adjustments,'" which Plaintiff claims was "readily apparent" from information Liberty Mutual and CCC possessed.[6] *See id.* ¶¶ 10, 13, 50; *see also id.* Ex. D at 1–3 (correspondence to Liberty Mutual

---

[6] In its original Complaint, but not the SAC, Plaintiff elaborated on its particular knowledge, alleging that it "had special knowledge of industry practices and of the pre-accident condition and fair market value of the totaled vehicle, and therefore knew that the Defendants' uniform 'condition' adjustments were fraudulent." Complaint (Dkt. No. 1-1) ¶ 14. Plaintiff further asserted that it brought the case because it "is concerned that ordinary consumers will not have similar

regarding offer).[7]  More specifically, on March 2, 2018, Plaintiff's employee, Alan Salit, contacted Liberty Mutual and complained about the results of its inspection, as well as the comparable vehicles identified in the valuation report (including Plaintiff's own vehicle[8]); asked for clarification regarding certain portions of the valuation report; and claimed that his vehicle was "probably worth $2,200 to $2,700 more than this flagrantly flawed valuation."  *Id.* Ex. D, at 2–3.

In response, Liberty Mutual agreed to "take a deeper dive" into the valuation and to "discuss [it] in greater detail."  *Id.* ¶ 77 & Ex. D.  On March 6, 2018, it sent a revised settlement offer to Plaintiff.  *See id.* ¶¶ 77–91 & Exs. D, F.  Liberty Mutual then obtained a second valuation from CCC, which Liberty Mutual provided to Plaintiff on March 6, 2018.  *See id.* ¶¶ 80–81 & Ex. E.[9]  The same day, Plaintiff, through Mr. Salit, again objected to the settlement offer, saying that it was "offended by the amount offered" and "bother[ed]" by alleged "flaws" in the valuations.  *See id.* ¶¶ 79 & Ex. D.  Plaintiff stated that "[i]f we can not come to an agreement by the end of today, I will be forwarding all of the documents and correspondence to my lawyer who will then handle it for me."  *Id.* Ex. D at 5.  Liberty Mutual advised Plaintiff of its options if it was not in agreement with the settlement offer:

> If [Plaintiff is] not in agreement with the evaluation please feel free to consider other options including pursuing a claim through your insurance company and/or passing [a Liberty employee's] information along to your attorney and have them reach out at their convenience.

---

knowledge."  *Id.* ¶ 15.

[7] All exhibits attached to Plaintiff's SAC were also before the Court in the FAC.

[8] Plaintiff admits that its vehicle may have been "inadvertently" included as one of the comparable vehicles in the original valuation report, because "Plaintiff is a small car dealership" and the vehicle was an "inventory car" (i.e., on sale), and thus its inclusion in CCC's comparable vehicle database is a unique situation that is not likely to occur frequently.  *See* SAC ¶ 5.

[9] This valuation report employed and described the same methodology discussed above.

*Id.* Ex. D at 6.

Plaintiff's attorney contacted Liberty Mutual on November 12, 2018,[10] requesting a "detailed" response concerning the condition adjustment made to comparable vehicles. *Id.* Ex. F at 1–3. Liberty Mutual replied on November 14, 2018, and asked Plaintiff's attorney to "please understand [that] we're willing to continue to work towards an amicable resolution." *Id.* at 5. Plaintiff did not accept Liberty Mutual's settlement offer or make a claim with its own insurer, and instead filed this putative class action against Liberty Mutual and CCC. *See* SAC ¶¶ 89–100 & Ex. E & F.

### B.    Plaintiff's Complaint and Defendants' Motions to Dismiss

Following Liberty Mutual's removal of this action to this Court, Plaintiff filed its FAC, alleging that Liberty Mutual and CCC "acted in concert in producing and employing fraudulent 'CCC One Market Valuation Reports' to support insufficient and unfair claim settlement offers in total loss vehicle claims in the State of New Jersey," based on alleged routine representations that all comparable vehicles in reports are in better condition than the claimants' pre-accident vehicles. FAC ¶¶ 1–2. Plaintiff alleged four causes of action on behalf of itself and a proposed class of first- and third-party claimants for violations of NJRICO, CFA, common law misrepresentation, and civil conspiracy, seeking damages, a declaratory judgment, and injunctive relief. *See id.* ¶¶ 94–135. Defendants moved to dismiss (Dkts. 23, 24) and this Court granted both motions in their entirety, without prejudice (Dkts. 35, 36).

In the Dismissal Opinion, this Court held that "[t]wo essential elements are shared across NJRICO, [] [CFA], and common law misrepresentation claims: (1) causation and reliance; and (2)

---

[10] Plaintiff's attorney apparently tried to contact Liberty Mutual on March 18, 2018, but Liberty Mutual said it did not receive any correspondence before November 12, 2018. SAC Ex. E. 4.

damages," and that Plaintiff had "failed to plausibly plead" either of those required elements. Dismissal Opinion at 12. In evaluating the latter element, this Court emphasized that Plaintiff did not allege any "out-of-pocket loss," did not allege any "loss in the value of the subject [loss] vehicle," and did not allege that it "actually *accepted* an improperly low[] amount for the subject vehicle." *Id.* at 13 (emphasis added). Accordingly, Plaintiff failed to plead injury. *Id.* Similarly, in evaluating the element of causation, this Court emphasized that Plaintiff did not allege that it *relied* on any of Defendant's alleged misrepresentations, and in fact pled that it had "knowledge to detect the fraudulent nature of the Defendants' 'condition adjustments.'" *Id.* at 12–13. The Court summed up this inconsistency as follows: "Plaintiff alleges that Defendants had a nefarious scheme," but Plaintiff "also alleges that it caught onto the scheme and was not duped." *Id.* at 1. The lack of causation and injury were each fatal to Plaintiff's NJRICO and CFA claims, as well as its claims of common law misrepresentation and civil conspiracy. *Id.* at 12–14.[11]

### C.      Plaintiff's Second Amended Complaint

On October 28, 2020, Plaintiff filed the SAC, restating its NJRICO and CFA claims against CCC, and dropping its claims for common law misrepresentation and civil conspiracy.[12] In the SAC, Plaintiff again does *not* allege that it accepted a settlement offer for the loss vehicle, that it experienced any out-of-pocket loss, or that the value of the loss vehicle has been reduced. Nor

---

[11] The Court also listed other deficiencies in the FAC, including that Plaintiff had failed to identify a "pattern of racketeering," as required under NJRICO, where only one act was alleged ("the alleged fraud in handling Plaintiff's third-party insurance claim"); that Plaintiff relied on "impermissible group pleadings" (alleging generally that "'Defendants' engaged in unlawful conduct"); and that Plaintiff failed to identify anything "improper" about Liberty Mutual's use of CCC's valuation reports, given that CCC is a state-approved valuation database under New Jersey law and Plaintiff did not allege that Liberty Mutual "knew" that the CCC reports were false or manipulated. Dismissal Opinion at 14–16.

[12] Plaintiff has added a non-class claim against Liberty Mutual only for payment of the "undisputed portion" of the third-party insurance claim. SAC ¶¶ 141–150.

does Plaintiff allege that it relied on CCC's allegedly fraudulent valuation reports.

The only new substantive allegations in the SAC are Plaintiffs' allegation that it "tendered possession" of the loss vehicle to Liberty Mutual, through counsel, and requested payment of the "undisputed" amount of the third-party claim settlement offer, without prejudice to Plaintiff's claims. SAC ¶ 100. Plaintiff alleges that "Defendants" declined the proposal, failing to identify which defendant engaged in the conduct. *See* Dismissal Opinion at 15 ("When different defendants are named in a complaint, plaintiff cannot refer to all defendants 'who occupied different positions and presumably had distinct roles in the alleged misconduct' without specifying 'which [d]efendants engaged in what wrongful conduct.'" (citation omitted). Despite the reference to "Defendants," CCC is not implicated in this allegation or the associated cause of action.

Plaintiff does not allege other changes in its posture *vis a vis* the loss vehicle or Plaintiff's settlement claim against Liberty Mutual; its allegations in the SAC mirror those in the FAC.

### III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing whether a plaintiff has met this standard, a court should look beyond conclusory allegations, unwarranted deductions of facts, legal conclusions, and formulaic recitations of the elements of a causation of action. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). Further, fraud-based claims must meet the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires a plaintiff to state with particularity the circumstances constituting the alleged fraud. *See Crete v. Resort Condos. Int'l, LLC*, No. 09-cv-5665, 2011 WL 666039, at *8 (D.N.J. Feb. 14, 2011) ("The fraudulent acts that comprise a RICO claim are subject to the heightened pleading requirements under Rule 9(b)."); *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 524 (D.N.J. 2008) (applying Fed. R. Civ. P. 9(b) to CFA claim); *Donnelly v. Option*

*One Mortg. Corp.*, No. 11-cv-7019, 2014 WL 1266209, at *11 (D.N.J. Mar. 26, 2014) ("Claims of common law fraud are subject to the pleadings standards of Rule 9(b)."). At a minimum, Rule 9(b) requires a plaintiff to allege the who, what, when, where, and how of the alleged fraud. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006); *Kowalsky v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-07856, 2015 WL 5770523, at *8 (D.N.J. Sept. 30, 2015).

Dismissal with prejudice is appropriate where further amendment would be futile. *U.S. ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014) (affirming denial of leave to amend where it would be futile); *Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 73–74 (3d. Cir. 1994) ("three attempts at a proper pleading is enough").

## IV.   ARGUMENT

For the reasons stated below, the SAC must be dismissed in its entirety, with prejudice.

### A.   The SAC Does Not Plead Essential Elements of NJRICO and CFA Claims

#### 1.   <u>Plaintiff's SAC Does Not Cure Plaintiff's Failure To Plead Injury</u>

Plaintiff's NJRICO and CFA claims require it to plead a cognizable loss or injury. Dismissal Opinion at 12. Plaintiff must show a "concrete financial loss" to plead a claim for NJRICO, and cannot claim "mere injury to a valuable intangible property interest." *Id.* at 10 (citing *Myrus Hack, LLC v. McDonald's Corp.*, No. 5-2700, 2009 WL 827176 (D.N.J. Mar. 30, 2009)); *see also In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *18 (D.N.J. Jul. 10, 2009) (dismissing RICO claim for failure to plead damages where plaintiffs alleged they purchased more expensive medicine than they would have if not for misstatements). To plead a CFA claim, Plaintiff must show an "actual loss" that is "quantifiable and measurable" or "real and demonstrable" as opposed to "hypothetical", "illusory" or "speculative." Dismissal Opinion at 10 (citing *Dicuio v. Brother Int'l Corp.*, No. 11-1447, 2012 WL 3278917 (D.N.J. Aug. 9, 2012)); *see also Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J.

234, 253 (2005) (dismissing CFA claim by plaintiff, finding that repairs to vehicle performed under warranty at no cost did not constitute loss under CFA). In the Dismissal Opinion, the Court held that Plaintiff failed to plead injury because it did not actually accept Liberty Mutual's allegedly low settlement offer. *See* Dismissal Opinion at 13. The Court also held that Plaintiff failed to allege any out-of-pocket costs or that its vehicle was otherwise reduced in value. *Id.* Plaintiff repeats the same allegations in the SAC as in the FAC and again fails to plead injury.

As before, Plaintiff cannot plausibly plead (or show) any loss, because it has not accepted the alleged underpayment offer or pleaded any out-of-pocket costs associated with the alleged wrongdoing. *See, e.g., In re Schering-Plough*, 2009 WL 2043604, at *18 (dismissing RICO claim for failure to plead damages where plaintiffs alleged they purchased more expensive medicine than they would have if not for defendant's misstatements); *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. at 253 (dismissing CFA claim, finding that repairs to vehicle performed under warranty at no cost did not constitute loss under the CFA). Plaintiff's property, rights, and finances *vis-à-vis* the loss vehicle have not changed since the time of the vehicle accident. Nor does anything in the SAC change the facts underlying the FAC—the same exhibits that were appended to Plaintiff's FAC are again appended to the SAC. *Compare* FAC ¶¶ 75-93 Exs. A–F *to* SAC ¶¶ 75-106 Exs. A–F. This Court already concluded despite these records that Plaintiff has not plausibly alleged any injury because Plaintiff did not accept Liberty Mutual's offer. *See* Dismissal Opinion at 13 ("Plaintiff does not allege that it accepted Defendants' settlement offer and therefore has not plausibly pled that he suffered any injury or damages."). The same result is compelled here.

Plaintiff attempts to sidestep this fatal defect by recasting the *unaccepted* March 6, 2018

settlement *offer* as a "final," injurious underpayment.  SAC ¶ 89-99.[13]  Plaintiff makes a strained, conclusory interpretation from its correspondence with Liberty Mutual that Liberty Mutual "clearly signaled" it would not offer more to settle the claim.  *Id.* ¶ 92  But Plaintiff's allegations are belied by the reality of the negotiations as represented in the exhibits to the SAC, which reflect a good faith, ongoing negotiation, not a take-it-or-leave-it offer.  When allegations contained in a complaint are contradicted by the document it cites, the document controls.  *Rapaport v. Weingast & Assoc. Inc.*, 859 F. Supp. 2d 706, 714 (DNJ April 30, 2012).  Here, the exhibits show a sequence of offers from Liberty Mutual in the course of a good faith negotiation, none of which Plaintiff accepted.  *See* SAC Ex. D at 1; id. Ex. A at 3 (noting "that the information [about the loss vehicle]" should be verified to ensure it "accurately reflects . . . aspects of the loss vehicle that may impact the value"); *id.* Ex. F at 4–5 (email from Liberty Mutual stating that Plaintiff could pursue a claim with its insurer, "we're willing to continue to work towards an amicable resolution," and that Plaintiff could provide "specific information . . . to substantiate the conditioning adjustments are not accurate" so that Liberty Mutual "can determine if it will impact the total loss evaluation").[14]

The nature of an unaccepted offer is not final—it presupposes negotiations during which

---

[13] The title of Section V of Plaintiff's SAC sums up the attempted pleading alchemy:  "Liberty Mutual clarifies that the revised claim settlement offer is its final offer, thereby establishing the [*sic*] Salit's damages and ascertainable loss."

[14] Recognizing that it did not accept Liberty Mutual's offer, Plaintiff attempts to identify a legal quagmire—that it could not accept the offer because it would have been required to waive its right to seek further payment, and thereby would have no means to recoup the balance of the alleged "underpayment."  SAC ¶¶ 97-98.  Not only do these allegations fail to establish an ascertainable loss, but Plaintiff itself identifies in the SAC a right to collect the full amount of Liberty's settlement offer *without* waiving any right to dispute any alleged outstanding balance, fundamentally undercutting its own premise.  *See* SAC ¶ 141 ("The New Jersey Fair Claims Settlement Regulation, at N.J.A.C. § 11:2-17.8(g) provide, '[I]n any case where there is no dispute as to one or more elements of a claim, payment for such element(s) shall be made notwithstanding the existence of disputes as to other elements of the claim where such payment can be made without prejudice to either party.'").

parties can be educated, change views, or correct the other's proposal, making lawsuits based on an offer premature. *See, e.g.*, *State v. Hancock*, 208 N.J. Super. 737, 743 (N.J. Super. Law Div. 1985) (action to condemn could not be instituted in part because prospective condemnee could respond to State's offer of compensation with an offer "higher than the appraisal," which is "an opinion, not a fact," and the "State can be educated during such negotiations [and] may learn that its comparable sales are not the best available, that its calculations are incorrect, that its survey is badly done, that it has overlooked important information"). Absent a conclusive change to its property or rights, Plaintiff cannot have been injured. *See, e.g.*, *D'Agostino v. Maldonado*, 216 N.J. 168, 198 (2013) ("[T]he existence of ascertainable loss resulting from a defendant's CFA violation should be determined on the basis of the plaintiffs' position following the . . . unlawful commercial practice . . . ."). If Plaintiff's theory of injury were correct, it could maintain this action against CCC based on the valuation even if Liberty Mutual made a separate, higher settlement payment. That is not the law.

Finally, Plaintiff is a third-party claimant, not an insured of Liberty Mutual. Even if Liberty Mutual refused to continue negotiating, Plaintiff has other recourses available to collect the amount it believes it is owed, including through its own insurer. Therefore, it has not pled a concrete injury. *See infra* § IV.B (claims are not ripe where extrajudicial means remain available).[15]

### 2. Plaintiff's SAC Does Not Cure The FAC's Failure To Plead Causation

Plaintiff also has not and cannot plausibly plead that the injury it claims to have occurred was caused by CCC, a deficiency that is fatal to all of Plaintiff's claims. Both NJRICO and CFA

---

[15] As discussed *infra* § IV.A.II, Section V of the SAC does not include any new allegations concerning CCC, revealing the absence of any causal connection between such an injury and CCC. And while Plaintiff cites two new statutes in the SAC, N.J.A.C. § 11:2-17.10(a)(1) (SAC ¶ 93) and N.J.A.C. § 11:2-17.8(g) (SAC ¶ 99), neither pertains to CCC.

require Plaintiff to plead "proximate cause" between any allegedly fraudulent statement by CCC and a purported loss by Plaintiff. *See*, *e.g.*, *Dist. 1199P Health & Welfare Plan*, 784 F. Supp. 2d 508 at 523–24, 532 (D.N.J. 2011) (explaining that NJRICO, fraud and negligent misrepresentation require proximate cause); *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 436 (D.N.J. 2012) ("To state a prima facie case under the CFA, a plaintiff must demonstrate . . . a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss."); *see also* Dismissal Opinion at 12 (setting forth standard). As the Court found, Plaintiff failed to meet this burden in the FAC because it did not allege that it "relied on [the] alleged misrepresentations" or accepted a settlement offer from Liberty Mutual—"as a result" of CCC's valuation reports or otherwise. Dismissal Opinion at 12. In fact, Plaintiff pled in the FAC that it had "knowledge to detect the fraud[]." *Id.* at 12–13.

Nothing in the SAC cures these failures. In *Lewis v. Gov't Empls. Ins. Co.*, 1:18-cv-05111, 2019 WL 1198910, at *4 n.2 (D.N.J. March. 14, 2019), this court considered whether an insurer could be liable under the CFA for a settlement payment to an insured that was allegedly reduced in the amount of a CCC condition adjustment. The court dismissed the CFA claim for lack of causation, finding that if the insured was entitled to anything, it was based on a "breach of contract"—that is, a claim that the insurer paid less than it owed to the insured—"not fraud." *Id.* This Court should reach the same result.

Plaintiff has not alleged that it accepted the offer (precluding any injury), and it has admitted it was not deceived by CCC's allegedly fraudulent valuation because it possessed "personal knowledge" that prevented it from being deceived, SAC ¶ 8. Plaintiff, moreover, does not allege that CCC caused Liberty Mutual to "refus[e] to consider" Plaintiff's objections (¶ 90), to "signal[]" it would not make any higher settlement offers (¶ 92), or to recommend that Plaintiff

pursue the claim through its own insurance company (¶ 93), or that CCC refused to tender payment of the "undisputed" portion of the claim without requiring the waiver of claims asserted in this action (¶¶ 97-100).  Plaintiff makes no allegation that CCC affected Liberty Mutual's settlement negotiation with Plaintiff *other than* by providing its opinion of value to Liberty Mutual—*not* to Plaintiff.  And as this Court found fatal in its Dismissal Opinion, Plaintiff still admits that it *rejected* and *did not rely on* CCC's opinion of value.

Thus, Plaintiff does not plead that it suffered an injury caused by CCC.  This defect is not curable, and therefore the SAC as against CCC should be dismissed with prejudice.

3.      CCC's Valuation Opinion Cannot Support A Claim for Fraud Under CFA Or Any NJRICO Predicate Act, Including Deceptive Business Practices, Theft By Deception, And Mail And Wire Fraud[16]

Plaintiff's NJRICO and CFA claims sound in fraud, but Plaintiff does not allege with particularity any deceptive act, statement, or "unlawful practice" by CCC, focusing instead on Plaintiff's apparent disagreement with CCC's methodology.[17]  In New Jersey, "fraud cannot be predicated on representations of value," which here were expressions of opinion by CCC.  *See Daibo v. Kirsch*, 316 N.J. Super. 580, 589–90 (App. Div. 1998) (finding no basis for equitable fraud because estimate provided by defendant was not expression of fact but of opinion based on assessment of value (quoting, *inter alia*, *Garden Realty Corp. v. Hadley*, 110 N.J. Eq. 474, 475–76 (E. & A. 1932) ("Value is a matter of opinion.");*Wright v. Westside Nursery*, 787 P.2d 508,

---

[16] CCC notes that the Court did not address these arguments in the Dismissal Opinion even though CCC raised them on its motion to dismiss.  In the SAC, Plaintiff makes no substantive changes to the allegations relevant to this argument.

[17] An "unlawful practice" under the CFA is defined in relevant part as "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance."  N.J.S.A. § 56:8-2.

512–13 (Utah Ct. App. 1990) ("[M]isrepresentations as to value do not ordinarily constitute fraud, as they are regarded as mere expressions of opinion or 'trader's talk' involving matter of judgment and estimation as to which men may differ."))).  Here, CCC fully disclosed on the face of the valuation report that it was an "opinion" of value "based on information provided to CCC by [Liberty Mutual]."  *See, e.g.*, SAC ¶¶ 18, 29 & Exs. A & E at 1.

Plaintiff's alleged dissatisfaction with CCC's valuation methodology does not establish that CCC acted with knowledge of falsity, intent to deceive, or recklessness, that is required to state a claim for CFA fraud and to establish *every* predicate NJRICO act alleged in the SAC.  *See Mango v. Pierce-Coombs*, 370 N.J. Super. 239, 250–51 (App. Div. 2004) (affirmative misrepresentation under CFA is "one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase"); *Barows v. Chase Manhattan Mortg. Corp.*, 465 F. Supp. 2d 347, 364–65 (D.N.J. 2006) (deceptive business practice is a "false or misleading written statement for the purpose of obtaining property or credit"); *State v. Cox*, 150 N.J. Super. 599, 604 (Law Div. 1977), *aff'd*, 160 N.J. Super. 28 (App. Div. 1978) (theft by deception requires "[a knowing] misrepresentation . . . with the specific intent to cheat or defraud")[18]; *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (mail and wire fraud

---

[18] Theft by deception additionally requires that Plaintiff "rel[ied] on [the] misrepresentation in parting with [its] property"; and that the defendant "receive[d] something of value as a result of the misrepresentation." *Id.*  Plaintiff's claim fails for the additional reason that it did not rely on CCC's alleged misrepresentations, SAC ¶¶ 8, 13, 75, 97-98, and Plaintiff does not allege that CCC received anything of value for the alleged misrepresentations, SAC ¶ 124 (alleging only that "Liberty Mutual and CCC acted as a continuing unit in producing and employing fraudulent [valuation reports] to support insufficient and unfair claim settlement offers").  *See Zanger v. Bank of Am., N.A.*, No. 10-cv-2480, 2011 WL 3501867, at *6 (D.N.J. Aug. 10, 2011) (applying heightened pleading standard of Fed. R. Civ. P. 9(b) to RICO claim based on predicate act of theft by deception and finding no reliance where plaintiff was not "tricked" by alleged misstatements).

require evidence of "the defendant's knowing and willful participation in a scheme or artifice to defraud . . . with the specific intent to defraud").

Plaintiff's disagreement with the valuation (*see* SAC Ex. D, at 1 ("[T]he valuation you provided . . . was valued way too low.")), its confusion over the offer from Liberty Mutual (*see* SAC ¶ 76 & Ex. D, at 2 ("I would like some clarification as to why each vehicle starts with a condition adjustment of $1,243.")), and its desire for further explanations (*see id.* ¶¶ 81–84) do not constitute plausible allegations that CCC's valuation was fraudulent.  *See Lewis*, 2019 WL 1198910, at *4 n.2 (explaining that failure to explain condition adjustment in valuation report was not affirmative misrepresentation but complaint about failure to explain); *In re Adolor Corp. Secs. Litig.*, 616 F. Supp. 2d 551, 567 (E.D. Pa. 2009) (allegations that clinical trials cited by pharmaceutical company were improperly conducted "amount[ed] to disagreements over the proper methodology and conduct of clinical studies" and could not "establish falsity" for purposes of Rule 10b-5 claim); *Slimm v. Bank of Am. Corp.*, No. 12-cv-5846, 2013 WL 1867035, at *22 (D.N.J. May 2, 2013) (dismissing RICO claims predicated on mail or wire fraud under Rule 12(b)(6) where plaintiff's "conclusory statements do not substantiate a finding that Defendants knowingly and willfully used the mail and wires in furtherance of a fraudulent scheme").  That a statement of opinion cannot be the basis of a fraud claim applies *a fortiori* here, where Plaintiff and CCC were not even negotiating a transaction.  *See Wright*, 787 P.2d 512–13 ("[M]isrepresentations as to value [are merely] 'trader's talk' . . . .").  Plaintiff does not allege that CCC was attempting to induce Plaintiff to make any purchase or that CCC and Plaintiff had any direct interaction whatsoever.  And Plaintiff does not allege that the valuation reports it received were generated inconsistently with the disclosed methodology, disputing only CCC's opinion of value.  *Daibo*, 316 N.J. Super. at 589–90 (opinions are not actionable as fraud).

Plaintiff also has not plausibly alleged fraud based on alleged errors in the February 23, 2018 valuation report it received from Liberty Mutual.  After receiving that report, and without accepting the then-outstanding settlement offer from Liberty Mutual, Plaintiff complained that its vehicle was listed as a comparable vehicle and that another comparable vehicle, according to a Carmax report, had sustained prior damage.  Both of those alleged errors were removed from the second valuation report that Plaintiff received on March 6, 2018.  *See* SAC Exs. D–E.  Plaintiff does not allege that CCC or Liberty Mutual intended those alleged errors in the first place.  Plaintiff's only remaining dispute relates to the first half of the condition adjustment process, in which CCC "sets [each] comparable vehicle to Normal Wear condition, which the loss vehicle is also compared to in the Vehicle Condition section [of the report]."  SAC Exs. A & E at 7–8.  But the SAC alleges only that Plaintiff was dissatisfied with Liberty Mutual's explanation of CCC's process and does not plausibly allege that the process or result is fraudulent.  *See Lewis*, 2019 WL 1198910, at *4 n.2 (failure to explain condition adjustment in report was not affirmative misstatement).[19]

The failure to plead any deceptive act, statement, or practice or "unlawful practice" by CCC warrants dismissal of Plaintiff's NJRICO and CFA claims.  *See, e.g., Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 607–09 (D.N.J. 2016) (dismissing CFA claim even though complaint satisfied Rule 9(b) because allegedly deceptive advertising claims did not constitute material misrepresentations); *Dist. 1199P Health*, 784 F. Supp. 2d at 523–33 (dismissing NJRICO and CFA claims where no unlawful conduct was alleged that was causally connected to alleged

---

[19] The alleged "uniform[ity]," *e.g.*, SAC ¶ 5, of the condition adjustment to otherwise identical (or separately adjusted) dealer-listed vehicles to Normal Wear condition is consistent with the methodology described in the CCC valuation reports and not indicative of fraudulent intent.  *See supra* § IV.A.3.

injury); *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 187–88 (3d Cir. 2000) (dismissing RICO claims where predicate acts were "completely insubstantial and border[ing] on the frivolous" and noting that the "allegedly injured plaintiffs . . . can avoid any injury simply by walking away from the alleged wrongdoers").[20]

    4.    <u>Plaintiff Does Not And Cannot Allege That CCC Participated In A Commercial Transaction Protected By CFA</u>[21]

Plaintiff asserts a claim against CCC under the CFA, N.J.S.A. § 56:8 *et seq.*, on the ground that CCC allegedly made false and deceptive statements about the value of comparable vehicles used in valuations that informed Liberty Mutual's settlement offers, which Plaintiff did not accept. *See* SAC ¶¶ 135-38.  In addition to the other flaws described above, Plaintiff does not allege that CCC participated in a commercial transaction related to Plaintiff that would be protected by the CFA  *See Papergraphics Int'l, Inc. v. Correa*, 389 N.J. Super. 8, 13 (App. Div. 2006) ("[T]he CFA does not cover every sale in the marketplace.  Rather, CFA applicability hinges on the nature of a transaction."); *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514 (3d Cir. 2006) (same).

*First*, CCC's provision of a valuation report to Liberty Mutual in the course of its resolution of a third-party insurance claim is not a "consumer transaction" covered by the CFA.  The CFA

---

[20]  The NJRICO claim fails for the additional reasons that Plaintiff has not pleaded a "pattern" of activity.  As the Court noted, a "pattern of racketeering" is statutorily defined as engaging in two or more predicate acts under NJRICO.  Dismissal Opinion at 14 (citing N.J. Stat. Ann. § 2C:41-1(d)(1)).  Exactly as it did in the FAC, Plaintiff in the SAC has alleged at most one criminal act: "the alleged fraud in handling Plaintiff's third-party insurance claim, specifically as to the [CCC] [r]eport."  *Id.*; SAC ¶¶ 28, 74-102.  Plaintiff cannot rely on unnamed class members to transform a single act (at most) into a pattern of conduct.  *Id.*; *see also* Liberty Mutual's Motion to Dismiss the Second Amended Complaint.  In addition, to the extent the NJRICO claim survives, claims arising before August 15, 2015 are time-barred.  *See Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509–10 (3d Cir. 2006) (four-year statute of limitations for NJRICO claims).

[21]  CCC also raised this argument in its motion to dismiss the FAC, but the Court did not address it.  Plaintiff made no changes to its allegations from the FAC to address CCC's arguments.

protects "consumers who purchase 'goods or services generally sold to the public at large.'" *Cetel*, 460 F.3d at 514 (citation omitted); *see also Arc Networks, Inc. v. Gold Phone Card Co., Inc.*, 333 N.J. Super. 587, 589 (Law. Div. 2000) ("The entire thrust of the Act is pointed to products and services sold to consumers in the popular sense."); *see also S. Broward Hosp. Dist. v. MedQuist Inc.*, 516 F. Supp. 2d 370, 399 (D.N.J. 2007); N.J.S.A. § 56:8-1(c) ("merchandise" includes goods, services, or anything offered directly or indirectly to public for sale). CCC, however, provided a valuation of a vehicle to Liberty Mutual, which then provided that valuation to Plaintiff, a third-party claimant with whom Liberty Mutual had no contractual relationship. *See* SAC ¶¶ 23–106 & Exs. A, D–F. Plaintiff does not allege that CCC's service was offered directly to Plaintiff, insureds, third-party claimants, or the public generally. *See id.* ¶ 131 (alleging in CFA cause of action that insurance policies *Liberty Mutual* sold to insureds are "merchandise" under the CFA). In fact, the CFA claim does not mention CCC at all. *See id.* ¶¶ 130–40.

Simply put, there are no plausible, particularized allegations that CCC's valuations, or any transaction by which they were provided to Liberty Mutual, are a "product[] and service[] sold to consumers in the popular sense" that falls within the ambit of the CFA. *See Arc Networks*, 333 N.J. Super. at 589 (citation omitted); *see also Cetel*, 460 F.3d at 514–15 (CFA did not cover sale of Voluntary Employee Beneficiary Associations, because they were "complex tax avoidance schemes" that "were not available to the general public and were never marketed as such," as opposed to "a discrete and specific class of capable investors."); *Bracco Diagnostics Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 561 (D.N.J. 2002) (plaintiff's use of the defendant's accounting, inventory and chargeback processing services was not covered by the CFA, because the defendant did not "sell those. . . functions to the public, either directly or indirectly"); *Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*, 957 F. Supp. 562, 567 n.6 (D.N.J. 1997) (defendant's

services related to financial planning, store planning, and merchandising were not services sold to general public and thus not "merchandise" under CFA, and explaining that "[t]hese services, if offered, were collateral to a contract for the sale of products to a wholesaler[, and a]s such, they do not qualify Windsor as a consumer"); *Stella v. Dean Witter Reynolds, Inc.*, 241 N.J. Super. 55, 75 (App. Div. 1990) (fraud in sale of shares of stock or other securities was not covered by CFA).

*Second*, Plaintiff is not a "consumer" with respect to CCC.  Plaintiff made a third-party insurance claim to Liberty Mutual, with which Plaintiff had no contractual or consumer relationship, and Liberty Mutual requested a valuation from CCC to assist Liberty Mutual in resolving Plaintiff's claim.  *See* SAC ¶¶ 23–106 & Exs. A, D–F.  Plaintiff never sought, requested, purchased, or entered into any kind of consumer-merchant relationship with CCC.  *See, e.g.*, *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-cv-2211, 2019 WL 1418129, at *18 (D.N.J. Mar. 29, 2019) (third-party payors are not consumers under CFA because they do not use or consume specific products themselves); *Standard Fire Ins. Co. v. MTU Detroit Diesel, Inc.*, No. 07-cv-3827, 2009 WL 2568199, at *5 (D.N.J. Aug. 13, 2009) (insurer lacked CFA standing to sue manufacturer of engine that damaged yacht because it was not in a "consumer oriented situation" with respect to manufacturer); *Papergraphics*, 389 N.J. Super. at 13–14 (wholesale purchase of ink cartridges for resale at significant profit and not individual use not covered by CFA); *cf. Levy v. Edmund Buick-Pontiac, Ltd.*, 270 N.J. Super. 563, 567 (Law Div. 1993) (plaintiff was "merely the voluntary assignee of a right to pursue the claim; he has not demonstrated that he suffered any ascertainable loss.  Plaintiff assumed the claim, not the statutory relief afforded to the victim of the allegedly unconscionable conduct").

For all these reasons, Plaintiff has not pled the elements required to state a CFA claim against CCC and the CFA claim should be dismissed in its entirety with prejudice.

**B.      Plaintiff Fails to Establish Ripeness Or An Injury Fairly Traceable To CCC**

Plaintiff's claims also must be dismissed under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, as its continued failure to plead causation and damages establishes its claims are not ripe and it has not suffered a "concrete, particularized, and actual or imminent" injury that is "fairly traceable to [a] challenged action" by CCC.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).[22]

*First*, "ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action." *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 174 (3d Cir. 2001). "A claim is not ripe . . . if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations omitted).  Despite Plaintiff's unfounded assertion that it was injured by a rejected settlement *offer* in a third-party insurance claim negotiation, SAC ¶¶ 89-106, Plaintiff's only hope of identifying a claim against CCC is contingent on Plaintiff's future acceptance of the offer from Liberty Mutual. *See supra* § IV.A.1; *Texas*, 523 U.S. at 300.  Plaintiff is in precisely the same position now that it was in before it rejected Liberty Mutual's offers, and thus, Plaintiff has not pleaded causation or loss sufficient to establish Article III standing or ripeness.  *See, e.g.*, *D'Agostino v. Maldonado*, 216 N.J. 168, 198 (2013) ("[T]he existence of ascertainable loss resulting from a defendant's CFA

---

[22]  Plaintiff must show it "personally has suffered" harm because of CCC's conduct.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  Plaintiff cannot rely on absent, hypothetical class members to establish standing.  *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("[N]amed plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"); *Koronthaly v. L'Oreal USA, Inc.*, No. 07-cv-5588, 2008 WL 2938045, at *4 (D.N.J. July 29, 2008) ("[S]tanding cannot be . . . acquired through the back door of a class action.").

violation should be determined on the basis of the plaintiffs' position following the . . . unlawful commercial practice . . . .").

Here, Plaintiff was *not deceived* and rejected the first settlement offer from Liberty Mutual and attempted to negotiate a better offer, the disposition of that offer has *not* yet been resolved[23] and, pursuant to the normal settlement of third-party insurance claims, Plaintiff may still seek relief in other ways. *See, e.g.*, SAC ¶ 23 (admitting Plaintiff made third-party claim); *Port Auth. of N.Y. & N.J.*, 311 F.3d at 233 (detailing differences between first- and third-party claims). Plaintiff still is in possession of its vehicle, too. SAC ¶¶ 97–98. And Plaintiff does not plead that it cannot be made whole through other extrajudicial means, such as by making a claim with its own insurer. *See, e.g.*, *Cowell v. Palmer Twp.*, 263 F.3d 286, 290–91 (3d Cir. 2001) (holding plaintiffs' claims were unripe when they failed to avail themselves of Pennsylvania's inverse condemnation procedure for compensation); *Waxman v. Cliffs Nat. Res. Inc.*, 222 F. Supp. 3d 281, 288 (S.D.N.Y. 2016) ("Plaintiffs allege that they are injured because if Cliffs, at some indefinite point in the future, were to enter bankruptcy, the amount Plaintiffs recovered in that potential future bankruptcy may turn out to be less than it would have been in an imaginary alternative bankruptcy in which the 1.5L Notes did not exist. . . . However, there is no allegation a bankruptcy is imminent. This precludes finding an injury-in-fact, because '[t]he Court cannot decide a case with a hypothetical injury that may never occur.'"); *SC Note Acquisitions, LLC v. Wells Fargo Bank,*

---

[23] Plaintiff claims that Liberty Mutual "clearly signaled" on March 6, 2018 that it would not offer more than $8,412 plus tax (the amount of the March 6, 2018 settlement offer), making that offer the "best and final offer." SAC ¶ 90-103. Not only is such an allegation incapable of transforming an unaccepted offer into a legally concluded negotiation, but email records attached to the SAC indicate that Liberty Mutual remains "willing to continue to work towards an amicable resolution" and to consider any "specific information" to dispute the alleged inaccuracy of the condition adjustments to determine if they might "impact the total loss evaluation," SAC Ex. F at 6.

*N.A.*, 934 F. Supp. 2d 516, 526, 526–27 (E.D.N.Y. 2013) (no standing or ripeness based on allegations that defendants' actions caused company to lose status as "Real Estate Mortgage Investment Conduit," because IRS had not yet determined plaintiff was not entitled to status nor imposed tax liability), *aff'd*, 548 F. App'x 741 (2d Cir. 2014).

     *Second*, as explained above, Plaintiff's alleged injury is unmoored to any conduct by CCC. *See*, *e.g.*, *supra* § IV.A.2.  Plaintiff does not allege it sent any money to CCC, much less that it was deceived *by* CCC.  *See*, *e.g.*, *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (causation element of standing is "akin to 'but for' causation in tort").  Plaintiff *admits* it knew the estimates allegedly were wrong, and it refused to accept Liberty Mutual's offers because Plaintiff would have received below what it believes is the fair market value for its vehicle.  *See* SAC ¶¶ 8, 10, 13.  Plaintiff does not allege that CCC was obligated to pay any money to Plaintiff that CCC did not pay, and Plaintiff does not allege that CCC owed any duty to Plaintiff that CCC violated by providing its opinion of Plaintiff's total loss vehicle to Liberty Mutual.  *See, e.g.*, *In re Schering Plough Corp.*, 678 F.3d at 246–53 (3d Cir. 2012) (affirming dismissal for lack of Article III standing where complaint failed to sufficiently allege facts that plaintiff's off label purchases of certain drugs were traceable to defendant's practices as opposed to other misconduct); *Johnson v. GEICO Cas. Co.*, 673 F. Supp. 2d 244, 254–55 (D. Del. 2009) (holding that plaintiffs did not have standing to sue two entities for denial of benefits and performances to which plaintiffs claimed they were entitled to under insurance contracts, because plaintiffs' insurance policies were issued by two other insurance companies and therefore any injuries were not traceable to the other entities' conduct).

     Such an allegation would be somewhat nonsensical, given that CCC contracts directly with Liberty Mutual, not Plaintiff (as Plaintiff readily admits).  *See*, *e.g.*, *Port Auth. of N.Y. & N.J.*, 311

F.3d at 233; *Johnson*, 673 F. Supp. 2d at 254–55.  As such, even if Plaintiff's hypothetical injury

could establish ripeness or injury-in-fact, Plaintiff cannot tie CCC's conduct to any alleged injury.

*See, e.g.*, *Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 465 (D.N.J. 2013) (dismissing complaint

related to data breach for lack of standing because plaintiff failed to allege that defendant had any

"direct contact" with plaintiff or that defendant was in any way involved in loss of plaintiff's

information); *Johnson*, 673 F. Supp. 2d at 254.

Because Plaintiff has not pleaded a ripe claim or that any injury occurred as a result of

CCC's conduct in this case, all of Plaintiff's claims must be dismissed.  *See*, *e.g.*, *Reilly v. Ceridian*

*Corp.*, 664 F.3d 38, 46 (3d Cir. 2011) (affirming dismissal at the pleading stage under Fed. R. Civ.

P. 12(b)(1) for lack of standing); *In re Schering Ploug Corp.*, 678 F.3d at 253 (same).[24]

---

[24]   These failures also are fatal to Plaintiff's requests for declaratory and injunctive relief in
connection with the counts asserted against CCC.  Not only can Plaintiff's claims not survive
because the substantive claims against CCC must be dismissed, *see Edelman v. Croonquist*, No.
09-cv-1938, 2010 WL 1816180, at *9 (D.N.J. May 4, 2010), but in any event, Plaintiff has not
plausibly alleged that it "is likely to suffer future injury from the defendant's illegal conduct."  *A.S.
v. Harrison Twp. Bd. of Educ.*, 66 F. Supp. 3d 539, 546 (D.N.J. 2014) (quoting *Bostrom v. N.J.
Div. of Youth & Family Servs.*, 969 F. Supp. 2d 393, 417 (D.N.J. 2013)); *see City of Los Angeles
v. Lyons*, 461 U.S. 95, 111 (1983) (prospective relief requires showing plaintiff "will again be
wronged in a similar way"); *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (threat
of injury must be "sufficiently real and immediate," and "[p]ast exposure to illegal conduct does
not in itself show a present case or controversy regarding injunctive relief").  Among other things,
Plaintiff has not alleged it must continue to negotiate with Liberty Mutual or that it will suffer any
future total losses that will require a third-party claim to Liberty Mutual (versus a claim with its
own insurer), it will receive another CCC valuation with allegedly fraudulent and insufficient
disclosures, or it would believe a damages estimate from that valuation.  *See McNair*, 672 F.3d at
224–25 & n.15 (rejecting theory of standing for injunctive relief based on potential that plaintiffs
may accept offer to subscribe again to magazines and be subject to allegedly deceptive practices,
because "the law accords people the dignity of assuming that they act rationally, in light of the
information they possess," and "it can hardly be said that Appellants face a likelihood of future
injury when they . . . might be fooled by [the defendant's] renewal tactics once they accept that
offer").

Plaintiff's new allegations in the SAC cannot change this result.  Plaintiff's allegations that
it received Liberty Mutual's "best and final offer," SAC ¶ 90-103, are a strained attempt at

## V.   CONCLUSION

For the reasons stated herein, CCC respectfully requests that the Court dismiss Plaintiff's

Complaint with prejudice for failure to state a claim.  CCC further requests such additional relief

as this Court deems just.

Dated: December 11, 2020

Respectfully submitted,

/s/ *Steven F. Gooby*
Robert A. Assuncao
Steven F. Gooby
**ANSA ASSUNCAO, LLP**
100 Matwan Road, Suite 410
Matawan, NJ, 07747
Telephone:  (732) 993-9850
Facsimile:   (732) 993-9851
robert.assuncao@ansalaw.com
steven.gooby@ansalaw.com

Marguerite M. Sullivan (*pro hac vice*)
Jason R. Burt (*pro hac vice*)
George C. Chipev (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 11th Street NW, Suite 1000
Washington, DC 20004
Telephone:  (202) 637-2200
Facsimile:   (202) 637-2201
marguerite.sullivan@lw.com
jason.burt@lw.com
george.chipev@lw.com

*Attorneys for Defendant CCC Information Services Inc.*

---

constructing a "concrete" injury, in contravention of Plaintiff's own exhibits, *see* SAC Ex. F at 6, and do not go toward showing that Plaintiff will suffer future injury.  And CCC indisputably has no role determining whether Liberty Mutual makes payment to Plaintiff, so the new allegations do not implicate CCC or any future injury that conceivably could be caused by CCC.